**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| 14PNWDC LLC and 14PDC LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 26-1342 (LLA) |
| | ) | |
| ELMER ZAPATA-MERCADO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, AND FOR A RULING GRANTING LEAVE TO FILE THE AMENDED COMPLAINT

## INTRODUCTION

Plaintiffs renew their request for a temporary restraining order and preliminary injunction on a record that differs materially from the one before the Court on June 8, 2026. The Court denied the first motion on one ground: Plaintiffs had not shown irreparable harm that was certain and imminent, as opposed to anticipated. ECF No. 15 at 4–7. The Court did not reach likelihood of success, the balance of equities, or the public interest.

Three developments since June 8 bear directly on that ground. First, on or about July 22, 2026, the Board suspended the voting rights of Plaintiffs' four units, which together carry approximately 20% of the Association's vote. Second, on September 25, 2026, the Board served a Formal Notice of Default that declares the units more than sixty days delinquent, invokes Bylaws § 11.3, and states that the Board will notify Plaintiffs' mortgage lenders unless Plaintiffs pay $15,070.02 in full. Ex. A. Third, the Association's own ledgers show that none of the $15,070.02 is an unpaid regular assessment. The balance consists of fines imposed after this suit

was filed, special assessments levied after this suit was filed (most of them to fund the defense of this action), and late fees on those charges. Exs. B–E.

The memorandum proceeds as follows. Part I addresses irreparable harm, the element on which the prior motion failed, and explains how each deficiency the Court identified in June has been cured. Part II addresses likelihood of success on Plaintiffs' retaliation claims under 42 U.S.C. § 3617 and D.C. Code § 2-1402.61. Part III addresses the balance of equities and the public interest. Part IV addresses security, the reach of the order under Rule 65(d)(2), and Plaintiffs' fully briefed motion for leave to amend (ECF No. 26), which would make the Association a party.

The relief requested is narrow. Plaintiffs do not ask the Court to cancel any charge or to relieve them of any payment obligation. They ask the Court to bar, pending judgment, three uses of the disputed charges: notice to Plaintiffs' lenders, lien and foreclosure enforcement, and the suspension of Plaintiffs' voting rights. Plaintiffs will deposit $5,000 into the Registry of the Court, will continue to pay all regular assessments, and consent to tolling of the Association's lien-enforcement period.

## FACTUAL BACKGROUND

### A. The record before the Court on June 8

Plaintiffs own Units C01, C02, C03, and 402 at 14 P Street NW. ECF No. 1 ¶ 9. They filed this action on April 20, 2026. On May 26, the Board, with Defendants Zapata-Mercado and Arshad voting in favor, imposed fines of $200 per unit per day on Plaintiffs' four units for failure to provide lease documents. ECF No. 15 at 3. On May 28, the same Board members approved a $10,000 special assessment to fund counsel for "the defense of named individuals" in this action and gave each Individual Defendant a $2,575 ledger credit against future Association charges for

the retainer each had advanced toward that defense. ECF No. 27-2; SAC ¶¶ 274–276. The Court denied Plaintiffs' first motion on June 8. ECF No. 15.

**B. Plaintiffs produced the leases, and the Board retained the accrued fines**

Plaintiffs' counsel delivered the lease documentation for Units C01, C02, and C03 and advised that Unit 402 was vacant. Ehrenberg Decl. ¶ 2. On June 8, the Board sent a "Notice of Fine Cessation and Account Update" acknowledging receipt, stating that the lease-document fines had ceased for all units, and accepting the vacancy explanation for Unit 402. Eliopoulos Decl. ¶ [X] & Ex. G; SAC ¶¶ 335–336. The same notice stated that the fines already charged to Units C01, C02, and C03 would not be waived. *Id.* The same day, the Board posted a $2,000 charge to each of those units for "May 29 – Jun 7," bringing the fines to $2,400 per unit. Exs. B–D.

**C. The Board suspended Plaintiffs' voting rights over a disputed special assessment**

On July 15, the Board demanded $1,310, Plaintiffs' share of a $6,500 special assessment posted on June 1, within seven days. The notice stated that the voting rights of all four units would otherwise be "automatically suspended," and that Plaintiffs' obligations "remain fully binding regardless of any external disputes or ongoing legal matters." ECF No. 27-9 (Ex. F); SAC ¶¶ 360–363. Defendants have described this charge to the Court as "the first installment of the Legal Fees Assessment." ECF No. 27 at 26. The ledgers, however, post it separately from the "Association Counsel Fund" installments that began on July 1, and the SAC alleges that the proceeds of the $6,500 assessment were applied to an open-ended legal engagement. Exs. B–E; SAC ¶¶ 256–258. The suspension took effect on or about July 22. Ex. A. Plaintiffs' units carry approximately 20% of the Association's vote. ECF No. 27 at 5–6.

**D. The Board levied a second litigation assessment**

On September 1, the Association charged Plaintiffs' units a new "Special Assessment – September 2026 – Legal Defense" totaling $5,000: $1,500 (Unit C01), $1,225 (Unit C02), $1,450 (Unit C03), and $825 (Unit 402). Exs. B–E. This charge is separate from, and in addition to, the monthly "Association Counsel Fund" installments charged since July. *Id.*

**E. The September 25 Formal Notice of Default**

On September 25, the Board served a "Formal Notice of Default" on Plaintiffs' principal, with a copy to the managing agent. Ex. A. The notice states a total balance of $15,070.02; asserts that the balance has remained "unpaid for more than sixty (60) days"; invokes the direction in Bylaws § 7.5 to "take prompt action to collect"; and quotes Bylaws § 11.3's provision that the Board "shall" give written notice to mortgage holders. *Id.* It states that the Board has "not yet" notified Plaintiffs' lenders, that continued non-payment "will force the Board to act," and that payment in full is the only means "[t]o avoid any notice to mortgage holders." *Id.* The notice sets no deadline.

The ledgers attached to the notice show the composition of the balance. Plaintiffs paid every regular monthly assessment on every unit from January through September 2026. Exs. B–E. The claimed balance consists of the following:

| Category | C01 | C02 | C03 | 402 | Total |
|---|---|---|---|---|---|
| Lease-document fines (May 26 – Jun 7) | $2,400.00 | $2,400.00 | $2,400.00 | $0.00 | $7,200.00 |
| "Association Counsel Fund" litigation assessment (Jul–Sep) | $300.00 | $245.01 | $290.01 | $165.00 | $1,000.02 |
| "Legal Defense" special assessment (Sep 1) | $1,500.00 | $1,225.00 | $1,450.00 | $825.00 | $5,000.00 |
| June 1 special assessment ($6,500 building-wide) | $393.00 | $320.95 | $379.90 | $216.15 | $1,310.00 |
| Late fees ($35 × 4) | $140.00 | $140.00 | $140.00 | $140.00 | $560.00 |
| Unpaid regular monthly assessments | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total claimed** | **$4,733.00** | **$4,330.96** | **$4,659.91** | **$1,346.15** | **$15,070.02** |

Approximately 48% of the balance consists of fines imposed after this suit was filed, approximately 40% consists of assessments levied to fund the defense of this suit, approximately 9% is the disputed June 1 special assessment, and the remainder is late fees. The ledgers record the fines as "Covenant Violation Fee Income." Exs. B–D.

Defendants have described Plaintiffs' non-payment of the litigation assessment as one of Plaintiffs' litigation "tactics" and as part of a "pattern of gamesmanship." ECF No. 27 at 5, 29. That brief was filed on behalf of the Individual Defendants and the Association. *Id.* at 1 & n.1.

## LEGAL STANDARD

A party seeking a temporary restraining order or preliminary injunction must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm absent preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); ECF No. 15 at 4. Irreparable harm must be "certain, great and actual—not theoretical—and imminent." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Economic loss alone ordinarily does not qualify. *Wis. Gas*, 758 F.2d at 674. A movant who fails to show irreparable harm is not entitled to relief even if the other factors favor it. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

A prior denial does not bar a renewed motion. There is "no per se bar" to successive motions for preliminary relief, and a change in circumstances counsels in favor of considering a renewed request. *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 827 F. Supp. 3d 93, 101 n.3 (D.D.C. 2026). In *National Trust*, the court denied a first motion for lack of a sufficiently

imminent risk of irreparable harm and later granted a renewed motion because "[t]hings have changed": developments after the denial supplied the imminence the first record lacked. *Id.* at 115. Plaintiffs ask the Court to apply the June 8 analysis to the present record.

## ARGUMENT

### I. Plaintiffs Face Irreparable Harm That Is Certain and Imminent

The Court identified three deficiencies in the June record: enforcement was anticipated rather than underway; the fines were compensable and could be eliminated by compliance; and Plaintiffs had not explained how any financial injury would be irreparable. ECF No. 15 at 5–7. Each is addressed below.

#### A. Enforcement has begun, and its next step has been announced

In June, the Court found that Plaintiffs "allege[d] only that they are subject to ongoing daily fines and that they 'anticipate' further enforcement actions," and noted Plaintiffs' acknowledgment that they had "not yet been subject to collection remedies." ECF No. 15 at 6. The Court contrasted *Patriot-BSP City Center II v. U.S. Bank National Ass'n*, 715 F. Supp. 2d 91, 95–96 (D.D.C. 2010), in which the threatened loss of property was scheduled and concrete. ECF No. 15 at 5–6.

The record has changed in each respect. The Association has (1) formally declared Plaintiffs' units in default; (2) declared the default more than sixty days old; (3) suspended Plaintiffs' voting rights as a collection remedy; (4) invoked the Bylaws provision directing "prompt action to collect"; and (5) stated that its governing documents "will force the Board to act" by notifying Plaintiffs' mortgage lenders. Ex. A. Because the notice sets no deadline, lender notice may issue on any day without further warning.

The notice also has statutory consequences. Under the D.C. Condominium Act, an association's lien for assessments arises when the assessment becomes due and payable and requires no recordation, and the association "shall have the power of sale to enforce a lien for an assessment against a condominium unit if an assessment is past due." D.C. Code § 42-1903.13(a), (b), (c)(1); *see also* ECF No. 27-10, § 14.8.4 (non-judicial power of sale). The Association has now declared these charges past due in writing. The threatened harm is therefore no longer the "mere possibility" the Court found insufficient in June. ECF No. 15 at 7.

**B. Notice to Plaintiffs' secured lenders would cause harm that cannot be reversed**

A notice under Bylaws § 11.3 informs a third-party creditor that its borrower is in default of obligations to the Association. Once sent, it cannot be withdrawn, and a later judgment that the underlying charges were retaliatory would not remove it from the lender's file.

Plaintiffs' four units secure a single commercial mortgage loan in the original principal amount of $850,000, made to both Plaintiffs as co-borrowers and secured by one deed of trust encumbering all four units. Eliopoulos Decl. ¶ 9. The loan documents require Plaintiffs to pay all "dues, fees, assessments and other charges" imposed by the Association, and they permit the lender to pay any unpaid association charges itself and add them to the secured debt at the 12% Default Rate. *Id.* ¶ 10. Two provisions make the Association's threatened notice consequential. First, an Event of Default occurs if "any other lien attaches to the Property without Lender's prior written consent," with no cure period. *Id.* ¶ 11 (quoting Loan Agreement § 5.1(h)(3)). Under the Condominium Act, the Association's lien for these charges arises without recordation, D.C. Code § 42-1903.13(a), (b), and the September 25 notice asserts that the charges are past due. Ex. A. Second, an uncured failure to pay association charges is a covenant default that, after notice, permits acceleration. Eliopoulos Decl. ¶ 11. Upon an Event of Default, the lender may declare

the entire balance immediately due; interest would accrue at 12% rather than 7.25%; a prepayment charge of 3% would apply; and the lender may exercise its power of sale against all four units. *Id.* ¶ 12. A notice under Bylaws § 11.3 would place before the lender a claimed default and an asserted lien that, under these provisions, give it the option to exercise each of those remedies.

The D.C. Circuit asks whether economic harm is "so great as to threaten [the movant's] continued existence." ECF No. 15 at 5 (quoting *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235 (D.C. Cir. 2025)). *Clevinger* applied that standard in denying relief because the loss there was remediable. The relevant measure here is not the $15,070.02 balance but the consequence of a reported default under the loan secured by Plaintiffs' units. Because the loan is cross-collateralized, a default asserted against any one unit exposes all four units, which comprise Plaintiffs' [entire] rental business, to acceleration and sale. Eliopoulos Decl. ¶¶ 2, 9, 12. That is the kind of loss that threatens a business's continued existence.

The threatened harm to Plaintiffs' financing is compounded by statements concerning leasing. The loan documents require Plaintiffs to "continuously engage in the businesses of ownership, leasing, maintenance, management and operation of the Property" and to operate it "as a residential rental property." Eliopoulos Decl. ¶ 13 (quoting Loan Agreement § 4.8(b)). At the Association's special meeting on [July 14, 2026], two Board members took the position that the Board may adopt rules prohibiting units from being leased. *Id.*; SAC ¶¶ 356–358. A prohibition of that kind would make it impossible for Plaintiffs to perform a covenant of their loan.

The threatened notice is also premature under the Association's own Bylaws. Section 11.3 permits notice to a mortgagee only after the owner has received written notice of a default

and has failed to cure within sixty days. ECF No. 27-10, § 11.3. The September 25 notice is the first notice of default addressing the $5,000 "Legal Defense" assessment charged on September 1. Ex. A; Exs. B–E. On the Association's own reading of § 11.3, that portion of the balance cannot be reported to a lender before late November. The Board nonetheless conditions the avoidance of lender notice on payment of the full $15,070.02 now.

### C. The suspension of Plaintiffs' voting rights is a continuing, non-economic injury

The voting suspension did not exist when the Court ruled in June, and it is not an economic injury. Plaintiffs' four units carry approximately 20% of the Association's vote. ECF No. 27 at 5–6. The Board suspended that vote over a disputed $1,310 special assessment that Defendants themselves describe as funding for the defense of this suit, *id.* at 26, after Plaintiffs had used their vote to seek owner oversight of the Board's litigation spending, *id.* at 11–12.

The loss has practical consequences. The Board's June 30 Resolution states that the Board "is currently evaluating whether the Association should take out a loan to finance the Lawsuit Fund." ECF No. 27-13; SAC ¶ 293. A loan would bind every owner, including Plaintiffs, to third-party debt that, unlike an assessment, cannot be refunded.

Courts in this District have held that the loss of electoral rights within an organization pending trial is irreparable, because "no amount of trial-awarded damages could compensate" for it. *Yager v. Carey*, No. 93-1970 (RCL), 1993 WL 816627, at *11 (D.D.C. Nov. 16, 1993) (collecting cases). *Yager* is unpublished and arose under the Labor-Management Reporting and Disclosure Act, but its reasoning applies equally here: in a union and in a condominium association alike, a member's vote in the organization's governance cannot be restored after the vote has occurred. *Yager* also requires the movant to show a substantial likelihood that the

suspension was unjustified or unfair. *Id.* at *12. Plaintiffs make that showing in Part II, including the Board's misapplication of Bylaws § 7.5 and the evidence of retaliatory motive.

Defendants may respond that Plaintiffs can restore their votes by paying $1,310. The suspension, however, conditions Plaintiffs' participation in the governance of their own Association on payment of a disputed charge levied after this suit was filed, which Defendants themselves tie to the defense of this action. Requiring Plaintiffs to pay, and thereby concede a charge they are litigating, is the form of pressure § 3617 prohibits; it does not cure the injury. If the charge is valid, it remains on the Association's books and the Association will collect it.

### D. The relief sought is directed at enforcement, not payment

The Court held in June that the fines, "while substantial, are plainly compensable," and that Plaintiffs had not identified irreparable harm from paying the legal-fees assessment. ECF No. 15 at 5–6. This motion is structured around that holding. Plaintiffs do not ask the Court to excuse payment of any charge or to remove any charge from the ledgers, and they will deposit $5,000 into the Registry of the Court as security. If the Association prevails, the charges remain collectible and its statutory lien remains in place. D.C. Code § 42-1903.13(a), (b). The relief sought is limited to preventing the use of the disputed charges as a basis for lender notice, lien enforcement, and the voting suspension while the Court decides whether the charges are lawful.

The Court also observed in June that Plaintiffs could "eliminate the fines" by addressing the Board's lease-document concerns. ECF No. 15 at 6. Plaintiffs did so. The Board acknowledged receipt of the leases and stopped the fines prospectively, but retained the $7,200 already charged. Ex. G; SAC ¶¶ 334–336. The accrued fines therefore no longer serve a compliance function. They are now the largest component of the default the Board proposes to report to Plaintiffs' lenders.

**E. Retaliation that burdens the prosecution of this action is itself irreparable**

The Association's position presents Plaintiffs with a choice: fund the defense of the individuals they have sued, or have their lenders notified of a default. Defendants characterize Plaintiffs' refusal to fund that defense as one of Plaintiffs' litigation "tactics." ECF No. 27 at 29. Section 3617 makes it unlawful to "coerce, intimidate, threaten, or interfere with" a person "on account of his having exercised" fair-housing rights. 42 U.S.C. § 3617. HUD's implementing regulation specifically prohibits "[r]etaliating against any person because that person has made a complaint . . . or participated in any manner in a proceeding under the Fair Housing Act." 24 C.F.R. § 100.400(c)(5); *see also id.* § 100.400(c)(6). The D.C. Circuit has recognized that federal courts may "afford interim injunctive relief against retaliatory transfers and other acts of reprisal" to protect a civil-rights claimant "from irreparable harm during the course of" the proceedings, because retaliation "may well dissuade [claimants] from ventilating their grievances." *Wagner v. Taylor*, 836 F.2d 566, 570, 574, 577 (D.C. Cir. 1987) (Title VII). The same principle applies here.

**II. Plaintiffs Are Likely to Succeed on Their Retaliation Claims**

Section 3617 of the Fair Housing Act makes it unlawful to "coerce, intimidate, threaten, or interfere with any person . . . on account of his having exercised or enjoyed" rights the Act protects. 42 U.S.C. § 3617. The prohibition reaches retaliation against a person who has filed a complaint or participated "in any manner in a proceeding under the Fair Housing Act." 24 C.F.R. § 100.400(c)(5). The D.C. Human Rights Act similarly makes it unlawful to "coerce, threaten, retaliate against, or interfere with" any person for exercising protected rights. D.C. Code § 2-1402.61(a).

A § 3617 retaliation claim has three elements: (1) protected activity, (2) an adverse action, and (3) a causal link between them. *Reese v. Park Place Condo. Homeowners Ass'n I*, No. 22-cv-02660 (CRC), 2023 WL 5833678, at *4 (D.D.C. Sept. 8, 2023) (unit owner's suit against condominium association; adopting the Seventh, Ninth, and Eleventh Circuit standard); *see also Palmer Heenan v. U.S. Dep't of Hous. & Urb. Dev.*, No. 25-cv-3343 (RC), 2026 WL 2906408, at *5 (D.D.C. Sept. 28, 2026) (§ 3617 claims are enforceable through 42 U.S.C. § 3613). A DCHRA retaliation claim requires the same three elements: protected activity, an adverse action, and a causal link between them. *Mazloum v. D.C. Metro. Police Dep't*, 522 F. Supp. 2d 24, 46 (D.D.C. 2007). Each element is established on the present record.

**A. Protected activity and adverse action**

Plaintiffs' protected activity is tied directly to discrimination the Fair Housing Act prohibits. The January 11, 2026 notice opposed statements directed at Plaintiffs' principal because of his race, and this lawsuit alleges race discrimination in the terms, conditions, and privileges of Plaintiffs' housing, which § 3604 prohibits. ECF No. 1 ¶¶ 26–29, 32–61. Filing an FHA suit is participation "in a proceeding under the Fair Housing Act," 24 C.F.R. § 100.400(c)(5), and the January 11 notice reported a discriminatory housing practice, *id.* § 100.400(c)(6). This distinguishes the present case from *Reese*, in which the plaintiff's reports of fraud and waste were not linked to any practice that §§ 3604–3606 prohibit. 2023 WL 5833678, at *4. The Officer Defendants know of the suit because they are defendants in it, and the Association knows of it because it has retained counsel to defend it. ECF No. 27 at 1 n.1, 8–9.

The actions at issue are fines directed at Plaintiffs' units, a collection campaign over litigation assessments, the suspension of Plaintiffs' voting rights, and a threat to report Plaintiffs to their secured lenders. Under the DCHRA's anti-retaliation provision, an action is materially

adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Propp v. Counterpart Int'l*, 39 A.3d 856, 863–64 (D.C. 2012) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The standard arose in the employment context, but its logic applies equally to a property owner deciding whether to pursue a fair-housing claim. Each of these actions meets it. Other courts of appeals have held that § 3617 reaches a condominium association's post-acquisition enforcement against an owner, *Bloch v. Frischholz*, 587 F.3d 771, 781–83 (7th Cir. 2009) (en banc), and a threat is actionable whether or not it is carried out, *id.* at 782–83. The statute "does not require a showing of force or violence for coercion, interference, intimidation, or threats to give rise to liability." *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001). The announced lender notice is therefore itself an adverse action, not merely a future one.

**B. Causal connection**

Four categories of evidence establish the causal link.

*Timing.* Five weeks after the Complaint was filed, the Board imposed the fines, and two days later it adopted the litigation assessment. ECF No. 15 at 3; ECF No. 27-2. Each subsequent step — the retention of the accrued fines after compliance (June 8), the voting suspension (July 22), the $5,000 "Legal Defense" assessment (September 1), and the notice of default (September 25) — followed the protected activity and tracked the litigation.

*Targeting.* The fines resolution was directed at Plaintiffs' four units. SAC ¶ 199; ECF No. 15 at 3. The SAC alleges that no other owner has been subjected to comparable fines, a threat of notice to mortgage holders, or a threatened suspension of voting rights. SAC ¶¶ 400–402. [Confirm and add: Eliopoulos Decl. ¶ [X].]

*Decision-makers.* Defendants Zapata-Mercado and Arshad voted in favor of the fines and the litigation assessment. ECF No. 15 at 3; ECF No. 27-2. The resolution that charges Plaintiffs for the defense of this action credited each Individual Defendant $2,575 against that person's own Association charges. ECF No. 27-2; SAC ¶ 276.

*Defendants' statements.* The July 15 notice stated that Plaintiffs' obligations "remain fully binding regardless of any external disputes or ongoing legal matters." Ex. F. Defendants' August 17 brief, joined by the Association, characterizes Plaintiffs' non-payment of the litigation assessment as one of Plaintiffs' litigation "tactics." ECF No. 27 at 29. By Defendants' own description, the collection effort responds to the manner in which Plaintiffs are prosecuting this case. In [September 2026], Defendants Zapata-Mercado and Arshad and the Board's Secretary told Plaintiffs' principal that the Board would raise every unit's monthly assessment by $500 and that they did not care. Eliopoulos Decl. ¶ 15. For Plaintiffs' four units, that increase would raise the combined regular assessment from $729.17 to approximately $2,729 per month. *Id.*; Exs. B–E.

### C. Departures from the governing instruments as evidence of retaliatory motive

Plaintiffs need not establish at this stage that each charge violates the condominium instruments. In the employment context, an employer's "departure from internal hiring procedures is a factor that the trier of fact may deem probative" of its true motivation. *Chappell-Johnson v. Bair*, 574 F. Supp. 2d 87, 97 n.12 (D.D.C. 2008) (quoting *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982)). The same inference is available when a condominium board departs from its own governing instruments in acting against an owner who has sued it. The record shows the following departures:

1. **The fines exceeded the fining power.** Bylaws § 5.1(13) authorizes fines only "for violations of the Rules and Regulations, and/or for late payment of assessments." ECF No. 27-10, § 5.1(13). The lease-delivery obligation the Board invoked appears in Bylaws § 9.14, not in any Rule or Regulation.
2. **No hearing preceded the fines.** The Condominium Act permits an association to levy reasonable fines only "after notice and an opportunity to be heard." D.C. Code § 42-1903.08(a)(11).
3. **The fines were retained after compliance.** The Board acknowledged receipt of the leases and stopped the fines on June 8, but posted a $2,000 charge per unit the same day and declined to waive any accrued amount. Ex. G; Exs. B–D. A fine retained after the owner has complied serves no remedial purpose.
4. **The voting suspension misapplied Bylaws § 7.5.** Section 7.5 confers a discretionary power to suspend the voting rights of an owner "in arrears in his or her payment of a common expense assessment by more than 30 days." ECF No. 27 at 26–27 (quoting § 7.5). The ledgers show no unpaid regular assessment. Exs. B–E. The July 15 notice nonetheless stated that suspension would be automatic after seven days. Ex. F.
5. **The indemnification determination was made by the indemnified directors.** Bylaws § 5.10 permits indemnification of a director or officer only "if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interest of the Association." ECF No. 27-10, § 5.10. The Board advanced defense costs on May 28. ECF No. 27-2. The good-faith determination on which Defendants rely appears in the June 30 Resolution, which was adopted after the advance by a

Board that included the two officers whose own defense costs were at issue. ECF No. 27-13. Defendant Deshommes is neither a director nor an officer. SAC ¶ 38.

6. **The threatened lender notice is premature.** As explained in Part I.B, § 11.3 requires sixty days after written notice of a default. The September 25 notice demands full payment of charges first noticed as a default on that date.

7. **The resolutions were not adopted by a Board constituted as the Bylaws require.** Section 5.3 fixes the Board at three directors elected by the unit owners. ECF No. 27-10, § 5.3. The Board, in turn, elects the officers, who serve at its pleasure and, except for the President, need not be directors. *Id.* §§ 6.1, 6.2, 6.4. At the August 10, 2025 election, however, the unit owners voted on a slate of four officers rather than three directors, and those four persons have since acted together as the Board. Eliopoulos Decl. ¶ 17. The May 28 and June 30 Resolutions were each executed by all four: the President (Defendant Zapata-Mercado), the Vice President (Defendant Arshad), the Secretary, and the Treasurer. ECF Nos. 27-2, 27-13; SAC ¶¶ 272–273. [Confirm whether the May 26 fines resolution reflects the same four votes and cite ECF No. 9-[X].] No amendment increasing the number of directors has been adopted. Eliopoulos Decl. ¶ 17; SAC ¶ 273; *see* ECF No. 27-10, § 13.1. A body acting in the Board's name without being constituted as the Bylaws require has departed from the governing instruments at their foundation.

Measured by the standard the Board applied to Plaintiffs, the individual Defendants who have served as officers of that body would themselves be subject to fines of $200 per day for each day of their tenure since the August 10, 2025 election. From August 10, 2025 through

October 5, 2026, a period of 421 days, that amounts to $84,200 for each of Defendants Zapata-Mercado and Arshad.[1]

**D. Facial authority is not a defense to retaliation**

Defendants contend that the Association is entitled to enforce its Bylaws and to fund its defense through assessments, and that "no cause of action can be sustained on a facially proper use of Association authority." ECF No. 27 at 8–9, 26–27. Authority to act does not include authority to act for a prohibited reason. Courts of appeals have held that a condominium board's enforcement of a facially neutral rule is actionable under § 3617 when it is used for a discriminatory or retaliatory purpose. *Bloch*, 587 F.3d at 781–83. A series of otherwise lawful administrative acts likewise violates § 3617 when undertaken in response to protected activity in order to coerce or intimidate. *Walker*, 272 F.3d at 1127–29. The DCHRA is to the same effect. As the D.C. Court of Appeals has explained, the statute "contains no safe harbor for otherwise lawful acts done for an improper retaliatory purpose." *Propp*, 39 A.3d at 866 (quoting *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 367 (D.C. 1993)). Plaintiffs addressed this argument in their Reply in support of leave. ECF No. [X], Part V.C.

The Court need not decide at this stage whether the Association may levy assessments to fund its defense. The narrower question is whether the Association may, while this action is pending, convert unadjudicated fines and litigation assessments into a reported default to Plaintiffs' lenders and a continuing suspension of Plaintiffs' vote. Because the requested order leaves every charge and every statutory lien in place, and Plaintiffs will deposit $5,000 into the Registry of the Court, the Association's asserted interest in funding its defense is protected.

---

[1] The Board has not fined any of its own members for this departure from the Bylaws. The only owners it has fined are Plaintiffs. Eliopoulos Decl. ¶¶ 16–17; ECF No. 15 at 3; Exs. B–D.

## III. The Balance of Equities and the Public Interest Favor a Narrow Order Preserving the Status Quo

The requested order deprives the Association of nothing to which it is entitled. It extinguishes no charge and no lien. The Association's lien for assessments arises by operation of law without recordation, D.C. Code § 42-1903.13(a), (b), and it remains in place while the order is in effect. Plaintiffs will continue to pay every regular monthly assessment, as they have throughout, and will deposit $5,000 into the Registry of the Court as security. Plaintiffs also consent, and the proposed order provides, that the three-year period within which the Association must enforce its lien, D.C. Code § 42-1903.13(e), is tolled while the order is in effect. The Association gives up only the use of lender notice, lien enforcement, and the voting suspension as leverage before the Court rules. Plaintiffs, by contrast, face the harms described in Part I, none of which can be reversed.

The order is also narrower than the relief sought in June. It does not bar the Board from acting, require the Officer Defendants to recuse, establish a lease-disclosure protocol, or prevent the levy of any assessment. It preserves the status quo that existed before the Association declared Plaintiffs in default and suspended their vote, pending a decision on the lawfulness of the charges. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974).

The public interest favors enforcement of federal and District fair-housing laws, including their protection of persons who invoke those laws against retaliation. 42 U.S.C. § 3617; D.C. Code § 2-1402.61(a). It also favors preserving the Court's ability to adjudicate a pending civil-rights action without one party using private enforcement powers to increase the cost of litigating it. No public interest is served by permitting unadjudicated charges to be reported to lenders as a default while their lawfulness is before the Court.

## IV. Security, Scope, and the Association

### A. Plaintiffs' $5,000 registry deposit is adequate security

Rule 65(c) requires security "in an amount that the court considers proper." Fed. R. Civ. P. 65(c). Although the requirement is "phrased in mandatory terms, the exact amount of security is left to the trial court's discretion," and a court may set modest security where the enjoined party faces little risk of monetary loss, provided it states its reasons. *L'Enfant Plaza Props., Inc. v. Fitness Sys., Inc.*, 354 A.2d 233, 236–37 (D.C. 1976) (construing the parallel D.C. rule). The record supplies those reasons. Every charge remains on the Association's books, its statutory lien remains in place, the enforcement period is tolled, and Plaintiffs continue to pay regular assessments. Plaintiffs will nonetheless deposit $5,000 into the Registry of the Court under Rule 67. Fed. R. Civ. P. 67; LCvR 67.1. That amount exceeds any loss the Association could incur from a temporary pause in lender notice, lien enforcement, and the voting suspension. No additional bond is necessary.

### B. The order may bind the Association under Rule 65(d)(2)

An injunction binds the parties; their "officers, agents, servants, employees, and attorneys"; and "other persons who are in active concert or participation" with them, if they receive actual notice. Fed. R. Civ. P. 65(d)(2). The Rule codifies the principle that defendants "may not nullify a decree by carrying out prohibited acts through aiders and abettors." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945); *see Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235, 1273 (S.D. Fla. 2025) (binding a non-party through an enjoined official's authority). Defendants Zapata-Mercado and Arshad are the Association's President and Vice President and voted for each action at issue. ECF No. 15 at 3. The Association acts only through its Board, and the actions Plaintiffs seek to restrain can be taken only by a Board on which they

sit. An order restraining the Officer Defendants from voting for, directing, or causing those actions, and binding persons in active concert with them who receive notice (including the Association, its Board, its managing agent, and its counsel), falls within Rule 65(d)(2).

The Association is also on notice of this litigation. It is represented by the same counsel as the Individual Defendants, has joined their opposition to Plaintiffs' motion for leave to amend, and has told the Court that it has been "shadow" defending this action since the outset. ECF No. 27 at 1 & n.1, 33.

### C. The Court should grant leave to file the Amended Complaint

The most direct way to ensure that the order reaches the Association is to make it a party. Plaintiffs' Motion for Leave to File Amended (and Supplemental) Complaint is fully briefed. ECF Nos. 26, 27, [X]. Granting it would join the Association, add Mr. Eliopoulos as a Plaintiff, and supplement the pleading under Rule 15(d) with the post-Complaint conduct at issue. Plaintiffs incorporate their motion, memorandum, and Reply by reference and note four points relevant to deciding that motion together with this one.

First, the Association's joinder is not genuinely disputed. Defendants argued in June that relief could not reach Association conduct because the Association was not a party. SAC ¶ 389. They now ask the Court to "permit the First Amended Complaint," a pleading that names the Association. ECF No. 27 at 33. The remaining disagreement concerns which pleading should be filed and on what terms. Reply, Parts I–III.

Second, the events since briefing closed on that motion support a prompt ruling. The most recent event in the briefing is the July 15 notice. Since then, the Association has suspended Plaintiffs' votes (July 22), levied a second litigation assessment (September 1), and declared Plaintiffs in default while threatening lender notice (September 25). Plaintiffs do not seek to add

these events to the SAC. They are offered as evidence that the course of conduct the SAC already pleads is continuing. The SAC alleges the threatened mortgage-holder notices, voting-rights suspension, and collection and lien threats as retaliation, SAC ¶¶ 184–185, 323–324, 360–366, 398, and seeks to restrain "mortgage-holder notices, statutory lien notices, foreclosure leverage, . . . voting-rights suspensions, . . . and related collection remedies," *id.* ¶ 11.

Third, Defendants' futility argument concerning the July 15 notice misstates the claim. Defendants argue that because Bylaws § 7.5 authorizes the Board to suspend voting rights, "no cause of action can be sustained on a facially proper use of Association authority." ECF No. 27 at 27. A retaliation claim turns not on whether the Board had the power to act but on why it exercised that power against these owners. *Bloch*, 587 F.3d at 781–83; *Walker*, 272 F.3d at 1127–29; Reply, Part V.C. The September ledgers confirm what the Reply noted could not be resolved against Plaintiffs on the pleadings: Plaintiffs are not in arrears on any regular common-expense assessment. Exs. B–E; *see* Reply, Part V.D.

Fourth, Defendants' request that leave be conditioned on payment of their fees (ECF No. 27 at 31–33) does not warrant delay. As the Reply explains, the request is not tied to any cost caused by the amendment, bypasses Rule 11 and the *Christiansburg* standard, and is unsupported by any invoice or amount. Reply, Part VII. The Court may grant leave now and deny or reserve the fee request.

**D. The requested relief is tied to the claims pleaded**

A preliminary injunction is appropriate to grant "intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945). Accordingly, the movant must show a relationship between the injury claimed in the motion and the conduct asserted in the complaint. *See Devose v. Herrington*, 42 F.3d 470,

471 (8th Cir. 1994) (per curiam). The relief requested here is drawn from the SAC, which alleges the Association's threatened mortgage-holder notices, collection and lien threats, and voting-rights suspension as retaliation for this lawsuit, SAC ¶¶ 184–185, 323–324, 360–366, 398, and prays for injunctive relief restraining those measures, *id.*, Prayer for Relief ¶¶ (h) (lien notices, mortgage-holder notices, foreclosure steps, and collection remedies on the challenged charges), (ah) (voting-rights suspension, late fees, and interest), (aj) (communications with mortgage holders), (ak) (foreclosure of any assessment lien).

The relief is also tied to the claims in the original Complaint, which alleges that Defendants retaliated against Plaintiffs and interfered with their fair-housing rights through Association processes, including selective enforcement of Association rules and threatened penalties. ECF No. 1 ¶¶ 18–20, 32–61. The conduct at issue continues that course of conduct, directed at the same units, by the same decision-makers.

## CONCLUSION

The harm that Plaintiffs anticipated in June has now been documented. The Association has declared Plaintiffs in default on charges consisting entirely of post-suit fines, post-suit assessments, and late fees on them; has suspended Plaintiffs' vote; and has announced that it will notify their lenders. Plaintiffs will deposit $5,000 into the Registry of the Court, and the requested order leaves every charge and every lien in place. For the reasons stated, Plaintiffs respectfully request that the Court:

1. grant Plaintiffs' Motion for Leave to File Amended Complaint (ECF No. 26) and deem the Amended Complaint filed as of the date of the order;
2. enter the proposed order granting a temporary restraining order and preliminary injunction; and

3. accept Plaintiffs' $5,000 registry deposit as security under Rule 65(c).

Dated: October 5, 2026

Respectfully submitted,

HOLON LAW PARTNERS LLP

/s/ Jason H. Ehrenberg
Jason H. Ehrenberg, Esq. (DC # 469077)
1178 Broadway, 3rd Floor #4503
New York, NY 10001
(T) (202) 888-3773
(E) jehrenberg@holonlaw.com

*Attorneys for Plaintiffs*
*14PNWDC LLC and 14PDC LLC*